*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

_____

Before
KING, LAWRENCE, and STEWART
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Steve G. AXE III**
Fire Controlman First Class, U.S. Navy
Appellant

**No. 201900009**

Decided: 27 July 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Shane E. Johnson

Sentence adjudged 12 September 2018 by a general court-martial convened at Joint Base Pearl Harbor-Hickam, Hawaii, consisting of officer members. Sentence approved by the convening authority: reduction to E-1, confinement for 60 months, and a dishonorable discharge.

For Appellant:
*Lieutenant Commander Kevin Larson, JAGC, USN*

For Appellee:
*Lieutenant Joshua C. Fiveson, JAGC, USN*
*Lieutenant Commander Timothy C. Ceder, JAGC, USN*

Senior Judge KING delivered the opinion of the Court, in which Judge LAWRENCE and Judge STEWART joined.

_____


**PUBLISHED OPINION OF THE COURT**


_____


KING, Senior Judge:

Appellant was convicted, contrary to his pleas, of one specification of attempted sexual assault of a child and two specifications of attempted sexual abuse of a child, in violation of Article 80, Uniform Code of Military Justice [UCMJ], 10 U.S.C. § 80 (2012), for communicating indecent language to, and arranging to meet and have sex with a fictitious individual named "Sarah." Appellant believed Sarah to be a 14-year-old female, but the individual with whom Appellant communicated was in fact an online persona portrayed by a special agent of the Air Force Office of Special Investigations [AFOSI].

Appellant asserts four assignments of error [AOE], renumbered as follows:[1] (1) the military judge abused his discretion when he denied in part a Defense motion to compel an expert consultant in forensic psychology; (2) the military judge abused his discretion when he denied a Defense motion to suppress a statement by Appellant under Military Rule of Evidence [Mil. R. Evid.] 404(b); (3) trial defense counsel [TDC] was ineffective for waiving a potential defense of entrapment; and (4) Appellant's convictions are not legally or factually sufficient because the special agent with whom Appellant communicated did not provide an age or gender in the chat application profile used to communicate with Appellant, and sent him images that were in fact of adults. We have carefully considered AOEs (3) and (4) and find them to be without merit. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987), *cert. denied*, 485 U.S. 968 (1988). We address AOEs (1) and (2), find no abuse of discretion, and affirm.


## I. BACKGROUND

As part of AFOSI's proactive efforts to combat Internet-based crimes against children, Special Agent [SA] JT set up a fictitious online persona named Sarah and posted a message on an Internet-based mobile messaging application. The initial post from SA JT included an image of pink sneakers

---

[1] AOEs 2-4 are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

with a text overlay reading "[s]o 14 and stuck on base . . . what is there 2 do."[2] Appellant responded to the post and numerous conversations took place between SA JT and Appellant in both the original and another web-based chat program over approximately three days. SA JT identified himself as Sarah to Appellant, told Appellant "she" lived with her parents onboard Joint Base Pearl Harbor-Hickam, and on numerous occasions expressed that she was 14 years old.[3] On the second day of their conversation, their communications became more sexual in nature, and Appellant sent Sarah a fully nude picture of himself. Appellant also asked Sarah if she was a virgin, "what [she has] done," and whether she liked various sexual acts.[4] On several occasions the two discussed the need to keep their communications and relationship "secret."[5]

Sarah asked Appellant if he had ever met "any other girls like me be-fore[?]" Appellant replied "one."[6] The following exchange then took place after the conversation again became sexual in nature:[7]

Appellant: I know a girl that LOVES gagging. . . . She's my hero, lol.

Sarah: OMG

Sarah: is that the girl that was my age?

Appellant: no, the girl your age became a pretty freaky girl. God I miss her sometimes

Sarah: lol well I am not there yet sorry maybe after time

Appellant: hopefully! Only time will tell![8]

---

[2] Pros. Ex. 1 at 1.

[3] Pros. Ex. 2.

[4] *Id.* at 7.

[5] *Id.* at 2, 4, 10.

[6] Pros. Ex. 3 at 2.

[7] At this point in the conversation, Appellant asked Sarah if she watched pornography, claimed that there was a lot that he could "teach her," that "someone who has sex a lot is probably someone who enjoys having fun and isn't afraid of what others think," and graphically stated that he was willing to discuss with her various sexual acts. Pros. Ex. 3 at 4-6.

[8] *Id.* at 6-7.

Eventually, Appellant and Sarah arranged to meet in Appellant's truck at a Hickam-area park near Sarah's home. When Appellant arrived at the designated location with condoms and takeout food specific to Sarah's request, he was promptly apprehended by AFOSI.

Appellant was charged with one specification of attempted sexual assault of a child for attempting to commit a sexual act upon Sarah, a person he believed to be a child who had attained the age of 12 years, but had not attained the age of 16 years, and two specifications of attempted sexual abuse of a child, for attempting to commit lewd acts upon Sarah by communicating indecent language to Sarah and sending her the aforementioned photograph.

Prior to trial, Appellant requested that the convening authority appoint a particular forensic psychologist, Dr. S, as an expert consultant to evaluate the merits of the Government's case and the Appellant's risk of recidivism.[9] The convening authority granted 20 hours of consultation with a different forensic psychologist, Dr. A, but limited that consultation to Appellant's risk of recidivism.[10] At trial, Appellant moved to compel the appointment of Dr. S, and to expand the permitted purposes of the consultation to those initially requested, arguing that he needed Dr. S to pursue the viability of a defense centered on the fact that Appellant engaged in a "dominant-daddy/little-girl" fetish lifestyle. Appellant stated in his motion that "[t]here are many facts in the evidence that raise questions as to [Appellant's] mindset regarding sexuality both in terms of the charged offenses and generally."[11] Those facts included that, in addition to Appellant's communications with Sarah, he used a fetish website for dating and told AFOSI agents that he texted Sarah because he "has issues."[12] TDC explained that he did not have the requisite background in psychology or human sexuality sufficient to analyze these facts, or how they might be utilized on the merits or at sentencing. Appellant also suggested that Dr. S. was needed to explore whether "the progression of events in this case is typical or atypical of a pedophile," to assess whether Appellant was merely "posturing" when he made comments to Sarah suggesting a prior relationship with an underage female, and to "analyze" Appellant's use of an online platform used to connect individuals sharing common

---

[9] Appellate Exhibit [App. Ex.] V.

[10] *Id.* at 21.

[11] *Id.* at 3.

[12] *Id.* at 5-6.

fetishes.[13] In both his written motion and at the hearing, TDC suggested that Dr. A was inadequate to help Appellant navigate these factual issues for reasons discussed below. [14]

Finally, Appellant moved to suppress certain statements made to Sarah regarding a relationship Appellant ostensibly had with a separate similarly-aged minor female. The military judge granted in part and denied in part both motions. The military judge denied Appellant's request for the appointment of Dr. S, but expanded the authorized purposes of consultation with Dr. A to include consultation on the merits.[15] He also denied Appellant's motion to suppress insofar as his statements were relevant under Mil. R. Evid. 404(b), but precluded the Government from introducing the same statements as evidence of propensity under Mil. R. Evid. 414.

## II. DISCUSSION

### A. Appellant's Right to Expert Assistance

#### 1. Standard of Review

We review a military judge's decision regarding expert assistance for an abuse of discretion. *United States v. Short*, 50 M.J. 370, 373 (C.A.A.F. 1999). An abuse of discretion occurs when a military judge renders findings of fact that are clearly erroneous, influenced by an erroneous view of the law, or outside the "range of choices reasonably arising from the applicable facts and law." *United States v. Miller*, 66 M.J. 306, 307 (C.A.A.F. 2008); *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010).[16]

---

[13] *Id.*

[14] *Id.* at 7.

[15] App. Ex. XLVII.

[16] Appellant cites *United States v. McAllister*, 64 M.J. 248 (C.A.A.F. 2007) for a broad proposition that erroneous denial of expert assistance is constitutional error, and thus, in the event error is found, a heightened standard of review for prejudice must be applied. Appellant's Brief at 15. However, not all denial of expert assistance is constitutional in nature. Only where such denial prevents an accused from exercising his right to present a defense will we find such error to be "constitutional." *Id.* at 251 (citations omitted). Such was not the case here, where Appellant was provided competent expert assistance.

*2. Pretrial Expert Assistance*

Appellant asserts that the military judge abused his discretion by approving Dr. A as an "adequate substitute" for Appellant's preferred expert, Dr. S. He argues that Dr. A did not possess similar qualifications as Dr. S, would not testify to the same conclusions as Dr. S, and that Dr. S. harbored a bias or conflict of interest that precluded his participation in Appellant's defense. The Government responds that Appellant waived any challenge to Dr. A and, in any event, he was an adequate substitute for Dr. S. We decline to extend waiver here and conclude that Dr. A was more than capable of assisting Appellant in "adequately preparing for trial"—the only analysis relevant to assessing the adequacy of an expert consultant.[17] *United States v. True*, 28 M.J. 1057, 1061 (N-M. Ct. Crim. App. 1989).

In support of their respective arguments, both parties cite a series of opinions dealing with expert witnesses. *See, e.g., United States v. Van Horn*, 26 M.J. 434, 437 (C.M.R. 1988) (request for an expert witness in toxicology); *United States v. Robinson*, 43 M.J. 501 (A.F. Ct. Crim. App. 1995) (defense sentencing witness); *United States v. Robinson*, 24 M.J. 649, 652 (N-M. Ct. Crim. App. 1987) (competing expert witnesses); *United States v. Delgado*, No. 200800346, 2009 CCA LEXIS 116 (N-M. Ct. Crim. App. May 8, 2009) (unpub. op.) (disposing of an appellant's motion for an expert witness based on the timeliness of the motion). We acknowledge some opacity in the case law governing expert consultants and expert witnesses and the parties' responses highlight the need for a reminder that they are indeed separate concepts. As we have stated, "the legal standards pertaining to a request for an expert witness . . . [are] a far cry from a request for an investigative assistant, despite their common source." *True*, 28 M.J. at 1061 (that common source being *Ake v. Oklahoma*, 470 U.S. 68 (1985), and Rule for Courts-Martial [R.C.M.]

---

[17] Where a military judge invites an accused to renew a request for an expert after its denial, a failure to do so may result in waiver. *United States v. Gunkle*, 55 M.J. 26, 32 (C.A.A.F. 2001). We also remind counsel that they do not necessarily shield themselves from waiver or forfeiture through the act of filing a motion and litigating an issue. *United States v. Cardreon*, 52 M.J. 213 (C.A.A.F. 1999). However, we decline to extend waiver here where the military judge's decision was based less on a future contingency that renders a motion truly "premature" (e.g., how evidence might come out at trial) and more on a simple lack of evidence at the time Appellant's motion was ruled upon. *See Gunkle*, 55 M.J. at 31. Here, while the military judge invited Appellant to renew his request upon a demonstration of "good cause," the ruling was sufficiently definitive based on the information before the military judge at the time for us to address the merits of the ruling. Record [R.] at 160, 165-67.

703(d)). In seeking pretrial expert assistance, Appellant here is on a "far different journey" than one seeking expert testimony. *Id.* (explaining how assistance in trial preparation is different than assistance in countering a proposed adverse government witness).

Contrary to Appellant's argument, the law governing pretrial expert assistance does not require a tit-for-tat comparison of the professional qualifications of Doctors A and S. Nor must the trial court consider divergences in speculative testimony between expert consultants. This is so because the government is not required to employ the expert consultant of Appellant's choosing, nor one with precisely equivalent professional qualifications as any defense-requested expert. *Short,* 50 M.J. 373; *True,* 28 M.J. at 1061; *see also United States v. Tharpe,* 38 M.J. 8, 14 n. 4 (C.M.A. 1993) (discussing appellate expert assistance, and noting that "only in the extraordinary case" would a military judge require that a particular expert be appointed). The standards set forth in cases like *Robinson,* on which Appellant relies, and wherein the focus is on expert *witnesses,* are inapplicable when assessing the adequacy of government-funded expert *consultants. True,* 28 M.J. at 1060-61.

Instead, the requirement that the government provide for expert consultation stems from the Due Process demand that an accused be given the "basic tools" necessary to present a defense. *Short,* 50 M.J. at 373; *United States v. Garries,* 22 M.J. 288 (C.M.A. 1986). This right to expert assistance is triggered upon a demonstration of both necessity, and that denial of expert assistance would "result in a fundamentally unfair trial." *United States v. Freeman,* 65 M.J. 451, 458 (C.A.A.F. 2008) (citations omitted); *United States v. Gonzalez,* 39 M.J. 459, 461 (C.M.A. 1994) (setting forth a three-part test for necessity). A "mere possibility" that an expert could provide assistance is not enough to demonstrate necessity. *Freeman,* 65 M.J. at 458 (citations omitted). But once necessity is established, the government is required to provide an accused with an expert who can provide "competent assistance" to counsel in exploring those issues requiring expertise. *Short,* 50 M.J. at 373 (citing *Garries,* 22 M.J. at 290-91); *see also True,* 28 M.J. 1062 (couching the standard as whether the government-funded expert is sufficient to assist the accused in preparing for trial). In that "competent assistance" is the relevant inquiry, it is the rare case where comparison between qualified expert consultants would be relevant. *See generally United States v. Warner,* 62 M.J. 114, 120 (C.A.A.F. 2005) (by availing itself of the pretrial assistance of the preeminent expert in shaken baby syndrome, while providing the defense with an expert consultant with far inferior credentials in the field, the government violated Article 46, UCMJ).

A different standard applies to expert witnesses. There, the focus is on the testimony of the witness and the standards set forth in R.C.M. 703 govern.

When the testimony of an expert is both relevant and necessary to an accused's defense, the government is required to provide either the expert requested, or an "adequate substitute." Rule for Courts-Martial [R.C.M.] 703(d)(2)(i); *United States v. Pomarleau*, 57 M.J. 351, 359 (C.A.A.F. 2002). This rule gives effect to the letter and spirit of Article 46, UCMJ, 10 U.S.C. § 846 ("[i]n a case referred for trial by court-martial, the trial counsel, defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence"); *see also United States v. Van Horn*, 26 M.J. 434, 436 (C.M.A. 1988). When an accused requests a particular expert witness, their qualifications when compared to any substitute witness may then be relevant given the fact that the witness' credibility is typically at issue. Similarly, were the government-offered substitute unwilling to testify to the same conclusions as the defense-requested expert, the argument could be made that the accused is deprived of his Sixth Amendment right to compulsory process for witnesses "in his favor." *Robinson*, 24 M.J. at 652. Accordingly, in order for a substitute expert witness to be "adequate" under R.C.M. 703(d), they must "possess similar professional qualifications" and be willing to testify to the same "conclusions and opinions" as the defense-requested expert witness. *Robinson*, 24 M.J. at 652 (citing *Ake v. Oklahoma*, 470 U.S. 68 (1985)).

Turning to the military judge's decision, we assume arguendo that Appellant demonstrated the necessity for expert assistance to explore his theory that Appellant's "dominant-daddy/little-girl" fetish lifestyle impacted his perception of Sarah's age.[18] The next question is whether Dr. A was capable of providing that assistance. A board-certified forensic psychologist with decades of experience in that field, Dr. A has published in his field many times over, has testified in numerous criminal cases, and testified during a pretrial hearing in the instant case with competence on the issues requiring expertise. He also clearly articulated the various psychological tests that he would perform on Appellant as part of his evaluation.

---

[18] Appellant asserts that the Government conceded necessity at trial. Appellant's Brief at 16. However, the record indicates that while the Government agreed that Appellant required expertise with regards to his *risk of recidivism*, no such concession was made with regards to issues on the merits of Appellant's defense. App. Ex. VI at 3-7. In any event, the Government does not challenge on appeal that expert assistance on the merits was necessary.

TDC attempted to demonstrate Dr. A's inadequacy by contrasting him with his chosen expert.[19] However, given that neither expert had been presented with any evidence from the case, there was simply no reason for the military judge to believe that any difference between Dr. A and Dr. S should lead to a conclusion that Dr. A could not provide competent assistance. In fact, TDC's actions following the partial denial of his motion suggest he was satisfied with the outcome of which Appellant complains on appeal. After the military judge explained that TDC had leave to renew his motion to compel Dr. S after availing himself of Dr. A's judicially-expanded services, TDC never revisited the issue.[20] If TDC believed Dr. A to be inadequate after consulting with him, he had ample opportunity to address the shortcomings of his original motion to compel, but chose to instead include Dr. A on his merits witness list.[21] While he did not call Dr. A to testify during the findings portion of the trial, he did call him to discuss recidivism at sentencing. The military judge's findings of fact were supported by the evidence; he employed the correct legal principles; and his application of those principles to the facts was reasonable. *Ellis*, 68 M.J. at 344. We find no abuse of discretion.

## B. Military Rule of Evidence 404(b)

Appellant next asserts that the military judge abused his discretion by permitting the Government to introduce communications between Appellant and Sarah regarding another sexual relationship involving Appellant and a

---

[19] Appellant also argues that Dr. A was somehow biased against the Defense or harbored a conflict of interest vis-à-vis his responsibility to become a member of the Defense team bound by rules of confidentiality simply because his son was facing legal issues of his own. Dr. A testified that he "bend[s] over backwards" to avoid even the appearance of impartiality in his professional work and we find no merit in this component of Appellant's argument. R. at 132. The instant matter is a far cry from situations in which we have considered bias in a government-funded expert, and those cases were analyzed in the context of the expert *witness. See United States v. Ndanyi*, 45 M.J. 315 (C.A.A.F. 1996) (declining to find that a substitute expert harbored impermissible bias because the expert was employed by the government). We also note that the military judge ensured that—were Dr. A to become a witness—the Government would not attempt to cross-examine him regarding his son's legal concerns.

[20] R. at 165-67.

[21] App. Ex. XXI. Appellant listed four witnesses on his first witness list. He specified that two would testify at sentencing as character witnesses. Dr. A was not one of those two, suggesting that Appellant was prepared to use his testimony in his case in chief despite ultimately not doing so.

female "like [Sarah]." The military judge permitted the evidence under Mil. R. Evid. 404(b) as evidence tending to demonstrate intent, plan, knowledge, and in the event an entrapment defense was raised, predisposition.

Mil. R. Evid. 404(b) permits the admission of evidence of other crimes, wrongs, or acts so long as that evidence is relevant for a purpose other than to prove propensity. *See United States v. McDonald*, 59 M.J. 426, 429 (C.A.A.F. 2004). The Court of Appeals for the Armed Forces established a three-part test to determine the admissibility of such evidence under Mil. R. Evid. 404(b); the proffered evidence must satisfy all three prongs to be admissible: (1) "Does the evidence reasonably support a finding by the court members that appellant committed prior crimes, wrongs, or acts;" (2) "What fact . . . of consequence is made more or less probable by the existence of this evidence;" and (3) "Is the probative value . . . substantially outweighed by the danger of unfair prejudice?" *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989) (citations and internal quotation marks omitted).

"The first two prongs address the logical relevance of the evidence" while the third prong "ensures that the evidence is legally . . . relevant." *McDonald*, 59 M.J. at 429. The first prong of the *Reynolds* test asks us to determine if the members could reasonably conclude that the "other act" occurred and that the accused was the actor. *Id; see also United States v. Dorsey*, 38 M.J. 244, 246 (C.M.A. 1993) ("the standard for meeting [prong one] is quite low"). The second prong can be said to ask whether the evidence sought is "probative of a material issue other than character." *Id.* (quoting *Huddleston v. United States*, 485 U.S. 681, 686 (1988)). The third prong encapsulates the requirements of Mil. R. Evid. 403. With regard to this third prong, we note that a military judge "enjoys wide discretion" in applying Mil. R. Evid. 403. *United States v. Tyndale*, 56 M.J. 209, 215 (C.A.A.F. 2001) (citations omitted). Where a military judge undertakes a Mil. R. Evid. 403 analysis, and states his reasoning for admitting a given piece of evidence, we will only reverse for a "clear abuse of discretion." *Id.* (citations omitted).

Appellant suggests that because the evidence does not establish with greater certainty that he sexually assaulted a minor, there was no indication of *his* age at the time of the prior act, and that his reference to another girl was merely an "off-hand comment," the evidence fails all three prongs of *Reynolds*.[22] We disagree. Appellant's own words that he had previously met another girl "like [Sarah]" and that "the girl your age became pretty freaky" were made during a graphic sexual discussion in which Appellant described

---

[22] Appellant's Brief at 30.

sexual acts that he and Sarah might try, including "gagging," "choking," and "anal."[23] With this context in mind, the members could reasonably conclude that the other act at issue occurred. Because the admissibility of an "other act" under Mil. R. Evid. 404(b) does not depend on the criminality of that act, any question regarding Appellant's age at the time of that other act is less consequential. On the other hand, under Mil. R. Evid. 414, where the act in question must be a "prior offense of child molestation"—that is, a crime punishable under the UCMJ, other federal, or state law—Appellant's age at the time of any prior sexual activity with a girl "like Sarah" is far more relevant.[24]

We also agree with the military judge's conclusions regarding prongs two and three of *Reynolds*. Appellant claims that the lack of detail surrounding the messages at issue deprive them of probative value as to his intent to have sex with Sarah. However, in addition to their value to prove intent, these messages demonstrate Appellant's plan to normalize the sexual activity he described in his conversation with Sarah, and tend to show that Appellant had a clear knowledge of Sarah's age. The messages are highly probative of these relevant facts at issue and their probative value was not substantially outweighed by any danger of unfair prejudice, especially in light of the military judge's limiting instruction.[25] The military judge properly applied and articulated the *Reynolds* test, his logic was sound, he provided the members with an appropriate limiting instruction, and thus we find no abuse of discretion.

### III. CONCLUSION

After careful consideration of the record and briefs of appellate counsel, we find the approved findings and sentence are correct in law and fact and that no error materially prejudicial to Appellant's substantial rights occurred.

---

[23] Pros. Ex. 3 at 5-6.

[24] Though the military judge concluded that the evidence would have supported the members reasonably concluding that a prior act of child molestation occurred, he ultimately found that the probative value of the messages as evidence of propensity was outweighed by the danger of unfair prejudice.

[25] R. at 641. The military judge instructed the members that they may consider evidence that Appellant engaged in a prior sexual relationship with a 14-year-old girl only for its tendency, if any, to prove plan, knowledge, or intent. He instructed the members that they may not consider the evidence for any other purpose, including propensity.

UCMJ arts. 59, 66. The findings and sentence as approved by the convening authority are **AFFIRMED**.[26]

Judge LAWRENCE and Judge STEWART concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[26] We note that this decision is issued 17 days after the *Moreno* III date of 10 July 2020. In assessing whether the total processing time violated Appellant's Due Process right to speedy review of his court-martial, we consider the four factors the Court of Appeals for the Armed Forces identified in *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006): (1) the length of delay; (2) the reasons for the delay; (3) the Appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. The length of the delay is small and was attributable in part to the authoring judge's temporary reassignment outside the continental United States for 45 days. Appellant remains in confinement, has not asserted his right to a timely review, and we assess that he has not been prejudiced by this delay. Therefore, we find no violation of Appellant's Due Process rights.